45 C.C.P.A. (Patents).

**Application of Alexander M. WRIGHT.**

**Patent Appeal No. 6321.**

United States Court of Customs
and Patent Appeals.

June 18, 1958.

A. M. Prentiss, West Hartford, Conn.,
for appellant.

Clarence W. Moore, Washington, D. C.
(S. Wm. Cochran, Washington, D. C., of
counsel), for Commissioner of Patents.

Before JOHNSON, Chief Judge, and
O'CONNELL, WORLEY and RICH,
Judges.

RICH, Judge.

This appeal is from the decision of the
Board of Appeals affirming the action of
the examiner in rejecting claims 24 to
27 and 42 to 45 of the application of
Alexander M. Wright, entitled "Control
System for Turbo-Jet Engines," serial
No. 219,594, filed April 6, 1951.

Claims 1 to 23, 28 to 41, and 48 to 51
stand allowed.

Claims 24 and 42 are representative
of the appealed claims:

"24. For an aircraft turbo-jet
engine having a main combustion
chamber and a fuel pump for apply-
ing fuel thereto, a tailpipe with
means for supplying and burning
additional fuel therein, and an ex-
haust gas nozzle with means for
varying its area; a fuel control ap-
paratus comprising a unitary, her-
metically-sealed casing containing
therein: means for automatically
regulating the delivery of said pump
to said chamber in accordance with
a selected schedule of fuel flow to
said chamber, corresponding to vary-
ing conditions of airplane altitude
and speed, and ambient air tempera-
ture; means for automatically regu-
lating the rate of additional fuel
supply and means for automatically
coordinately controlling both of said
fuel regulating means.

"42. For an aircraft turbo-jet engine having a main combustion chamber and a fuel pump for supplying fuel thereto, a tailpipe with afterburners and means for supplying fuel thereto, and an exhaust gas nozzle with means for varying its area; a control apparatus comprising a unitary, hermetically-sealed casing containing: an acceleration fuel control for automatically regulating the supply of fuel to said chamber, during engine acceleration, a temperature control for automatically regulating the speed of the engine, a variable area control for automatically regulating the area of said nozzle, a deceleration fuel control for automatically regulating the supply of fuel to said chamber during deceleration of the engine, and an afterburner control for automatically regulating the supply of fuel to said afterburners; all of said regulating controls having means so operatively associated with each other as to constitute a unitary, integrated system for controlling the performance of said engine under various operating conditions, by coordinately regulating the fuel supply to said main combustion chamber and to said afterburners, and the area of said exhaust gas nozzle."

The subject matter of appellant's invention is a control device for a turbo-jet engine containing the conventional compressor, combustion chamber, gas turbine afterburner, and a tailpipe having means to vary the exhaust area. Fuel is taken from a tank by pumps and supplied in a controlled manner through conduits to the combustion chamber and the afterburner. Operation of a hydraulic motor varies the outlet area of the tailpipe by a controlled valve mechanism which opens and closes "eye-lids" over the exhaust. Said valve and the amount of fuel fed through said conduits are controlled by a unitary control apparatus. Said control apparatus consists of a number of control devices enclosed in a hermetically sealed casing which is filled with a fluid, such as the fluid to be used as fuel.

Even as shown in the schematic drawing of the application the above-mentioned unitary control apparatus is very complicated. However, a detailed familiarity with the control is unnecessary for the purposes of considering the claims on appeal. It is sufficient to note that the unitary control apparatus operates in accordance with the manual rotation of a lever and information furnished by sensing means from different parts of the plane.[1] This data is translated by mechanical devices into mechanical motion. For example, a pressure ratio is determined based on the relation of pressure at the pod inlet to pressure at the compressor outlet. Permissible values of said ratio relative to other conditions of operation have been previously determined empirically. A permissible value will be transformed into rotation of a shaft which will act accordingly on means to control the amount of fuel to be fed to the combustion chamber.

Similar means operate to control fuel flow to the afterburner and outlet nozzle area control valve to achieve the following objectives:

(1) Attainment of maximum fuel flow during acceleration at any condition of altitude, temperature, or airplane speed, consistent with avoidance of compressor stall, or excessive engine temperature.

(2) Control of exhaust nozzle area during acceleration and deceleration to permit the greatest possible change in engine speed per second.

(3) Control of fuel flow during deceleration to avoid lean blowout.

(4) Means to select and maintain the desired engine speed at any value between idle and full speed (rpm).

1. 1. A pitot tube at the pod entrance.
2. Temperature sensing device at the pod entrance.

3. Pitot tube at compressor outlet.
4. Pressure means responsive to centrifugal fly weights spinning in response to engine shaft rotation.

(5) Control of exhaust nozzle area to give maximum efficiency at every steady-state engine speed between idle and full speed.

(6) Means, at full engine speed, for selecting additional thrust by exhaust nozzle control at any value desired up to the maximum permitted by engine limitations.

(7) Means for attaining additional thrust by tailpipe afterburning, at any selected value up to maximum augmented thrust.

(8) Protection against loss of thrust in case of failure of afterburner ignition.

The reference relied upon is:

Sedille    2,580,962    January 1, 1952

Sedille shows a turbo-jet engine having a main burner, an afterburner, and means for varying the area of the exhaust gas nozzle in such a manner as to maintain the relationship set forth in the equation:

$$P_e/P_o = f \ (P_f/P_o)^2$$

There are instruments in the pilot's cockpit responsive to sensing means. By referring to the instruments, the pilot operates manual levers to adjust the fuel supply and exhaust nozzle area to maintain a correlated condition of variables according to the above-mentioned operating equation. This he does by lining up certain pointers.

In refusing to allow the claims on appeal the board indicated that while appellant had disclosed an invention, he had not properly claimed it in these claims.

Claims 24 to 27 have been rejected as failing to define patentably over the Sedille reference and claims 42 to 45 were rejected as failing to point out the invention in the manner required by 35 U.S.C. § 112. Since these rejections raise different issues, they will be considered separately.

The rejection of claims 24 to 27
on the Sedille reference.

■ We have paraphrased appellant's brief to arrive at the following synopsis of the claims:

Claim 24.

(A) means for automatically regulating the fuel supply to the main combustion chamber burners,

(B) means for automatically regulating the rate of additional fuel supply to the tailpipe (afterburners); and

(C) means for coordinately controlling both of said fuel regulating means (A & B).

Claim 25.

(A) means (A) of claim 24;

(D) "means for regulating said (exhaust gas) nozzle area varying means"; and

(E) "means for automatically controlling coordinately both of said regulating means" (A) & (D).

Claim 26.

(A) means (A) of claim 24;

(F) "means for automatically regulating the speed of the engine so as to maintain a constant selected speed under said varying conditions"; and

(G) "means for automatically controlling coordinately both of said regulating means" (A) & (F).

Claim 27.

(A) means (A) of claim 24;

(F) means (F) of claim 26;

(D') automatic means (D) of claim 25; and

(H) "means for automatically controlling coordinately all of said regulating means" (A), (F) & (D').

The issue involved as to this first group of claims centers on language such as the following taken from claim 24.

" * * * a fuel control apparatus comprising a unitary, hermetically-sealed casing containing therein:

2. $P_e$ designates the pressure ahead of the reaction jet nozzle, $P_o$ is the pressure at the suction end of the compressor, $P_f$ is the pressure inside the combustion chamber, and f is a function of $(P_f/P_o)$, depending upon the shape of a cam.

means for automatically regulating the delivery of said pump to said chamber in accordance with a selected schedule of fuel flow to said chamber, corresponding to varying conditions of airplane altitude and speed, and ambient air temperature; means for automatically regulating the rate of additional fuel supply and means for automatically coordinately controlling both of said fuel regulating means."

The Patent Office urges that the limitation of a "hermetically-sealed casing" has no patentable significance since the claims set forth nothing making sealing necessary or even desirable.

Considering the remainder of the above quoted portion of the claim, the Patent Office urges that appellant does not question that Sedille shows separate manual controls for regulating the fuel supply to the combustion chamber and afterburner, or that such regulation should conform to changing conditions, and thus the only question as to the patentability of claims 24 to 27 concerns the weight to be given the word "automatically"; and that since nothing in the claim calls for the use of any explicit "automatic" means, the case of In re Rundell, 48 F.2d 958, 959, 18 C.C.P.A. 1290, would appear to govern. That case said:

> "The mere statement that a device is to be operated automatically instead of by hand, without a claim specifying any particular automatic mechanism, is not the statement of an invention."

Lastly, the Patent Office urges that the operation of any one of the three manual controls of Sedille would inherently act to change the speed of the aircraft and thus Sedille has means to vary fuel supply in accordance with airplane speed, altitude, and ambient temperature; that alternatively, the instruments in the cockpit reflect changes in the above by the position of pointers on the instruments; that Sedille intends to operate according to a selected "schedule" indicated by the opposite ends of angular lines in said instruments; that when the pointers are adjacent opposite ends of the same line the relationship

$$P_e/P_o = f \ (P_f/P_o)$$

is maintained; and that the patent specification suggests that a factor involving a more direct measure of the absolute ambient temperature may be used.

Appellant lists 33 points of argument. We have consolidated them into what we consider the more important issues and will now consider them:

A. Appellant contends that Sedille's control system comprises three *separate* and independent levers which the pilot must manipulate simultaneously in such a manner as to satisfy the equation set forth *supra*; that even if it were possible for a pilot to manually manipulate simultaneously the three levers, such a manually operated system would require the full attention of the pilot; that results obtained therefrom would be variable depending on the dexterity of the pilot; and that in present day high speed jet aircraft such a system would be inadequate. Granting these contentions, appellant is dealing in mere hypothesis as to adequacy of pilot dexterity, the claims have no limitation as to the speed of the aircraft upon which the need for dexterity necessarily depends and, in any case, these arguments fail to point out how the claims distinguish from the reference.

B. Next appellant contends that in maintaining a correlated condition of variables according to the above-mentioned operating schedule:

$$P_e/P_o = f \ (P_f/P_o) \qquad (1)$$

the only result so obtained is that

$$(W_f, W'_fA) = \phi \ (P_e, P_o, P_f)^3$$

3. 1. $W_f$, $W'_f$=fuel flow to main and after burner combustion chambers.
    2. A=exhaust area.

3. P=pressure functions as noted in footnote 2 supra.
    4. $\phi$=a constant which is such as to satisfy the equation.

Appellant's reasoning on this point is as follows:

"A comparison of equations (1) and (2) above makes it at once apparent that the fuel flow ($W_f$) to the main burners could not possibly be regulated in accordance with a *selected schedule corresponding to varying conditions of airplane altitude* (H) and *speed* (V) and *ambient air temperature* ($T_1$), as specified in the appealed claims (24–27), since this would require that said fuel flow ($W_1$), be a selected function($\emptyset$) of the variables (H), (V), $T_1$, that is:

$$W_t = \emptyset (H, V, T_1)$$

"The function ($\emptyset$) of equation (2) above applies *only* to the pressures $P_e$, $P_o$, $P_f$, and must be such as to make them bear the relation to each other, as shown in equation (1) above. At the same time, in order that the fuel flow ($W_t$) be a function of airplane speed (V), it is essential that at least one of the pressures $P_e$, $P_o$, or $P_f$ (to which $\emptyset$ applies) be a measure of airplane speed (V). But this is clearly not the case, because even the pressure ($P_o$), which is more nearly related to (V) than either ($P_e$) or ($P_f$) does *not measure airplane speed* (V), since ($P_o$) is the *static pressure* of the air entering Sedille's engine, and such *static pressure cannot measure airplane speed.*" (Emphasis copied.)

We note that the claims merely require response to speed in the pressure measurement. Therefore, *any pressure measurement which varies in some way with speed* will satisfy the claims. It may be assumed that Sedille places his pressure sensing device in such a position as to be responsive to *all* mass flow rates which rates are a direct function of air speed. This mass rate of flow will necessarily reflect altitude (another of the claimed parameters).

4. See appellant's synopsis of claims supra.

5. See appellant's synopsis of claims supra.

Assuming, *arguendo,* that Sedille measures at some place not responsive to all air flow conditions, it would be within ordinary engineering skill to place a pressure responsive device in a position which would be responsive at all flow conditions in view of Sedille's teachings that he desires to measure such a parameter.

Reaching the above conclusion, it is not necessary for us to consider appellant's other contentions concerning the board's holding that Sedille teaches other parameters indicative of airplane speed.

C. Appellant next contends that claims 26 and 27 further define over Sedille by including means (F),[4] which "means" (F) is not shown in the reference. This contention concerns "automatically" accomplishing regulation. We agree with the board that the Rundell case, supra, is controlling and that a mere statement that a device is operated automatically instead of by hand, without specifying particular mechanisms to accomplish such, is not a statement of invention. It cannot, therefore, patentably distinguish from the reference.

Appellant also urges with respect to claim 27 that the claim has a further means (H) which "automatically" coordinates all the other regulating means (A), (F) and (D').[5] The Rundell case is controlling here as well.

D. Next, the board's holding that the manual operation of Sedille's three levers so as to vary $P_e$, $P_o$ and $P_f$ to bear relation to the formula:

$$P_e/P_o = f (P_f/P_o)$$

constitutes first "means" (A)[6] of claims 24 to 27, is urged by appellant to be erroneous because Sedille has no means for varying his fuel supply in accordance with airplane speed and ambient air temperature.

We have already considered the argument as to airplane speed. As to temperature, we note that Sedille expressly teaches that absolute ambient tempera-

6. Ibid.

ture may be used as a factor if desired. This is a teaching anticipating appellant's use thereof as a parameter. Therefore, since both parameters are taught by the reference, either or both may be incorporated into Sedille's device by ordinary engineering skill. Having incorporated either or both, movement of the control levers in the cockpit will vary speed in reference to them.

E. The board's contention that Sedille's pressure ($P_t$) is at the discharge end of the compressor is urged to be erroneous since the patentee expressly states such to be combustion chamber pressure. The board's contention that Sedille shows automatic means for varying the exhaust gas nozzle in accordance with the pressure at the outlet of the compressor is also urged to be erroneous because Sedille takes no pressure reading of the compressor outlet.

On this point we agree with the Patent Office brief that while it is correct that Sedille measures pressure *in* the combustion chamber rather than of the turbine outlet, the amount of pressure generated by the combustion of the gases is a function of the gases entering the chamber. Thus, whether or not appellant chooses to call these pressures different "engineering entities," (which he does), we believe the distinction is of no substance as applied to the instant claims.

F. Appellant is disturbed by the board's holding that the presence of fuel pumps in the Sedille device may be presumed. Here we are in full accord with the board. It may be assumed in this type of system that fuel pumps or their equivalents are used to move the fuel, and applicant's positive inclusion of such an element cannot patentably distinguish from Sedille.

G. The claims call for a "hermetically-sealed casing" which serves to protect the elements contained therein from dirt and the weather, and the board holding that Sedille's control apparatus could be housed in such a casing, if so desired, is urged to be erroneous. Appellant calls our attention to the fact that the board recognizes that such a hermetically sealed casing has obvious advantages over the Sedille arrangement.

We again must agree with the board that one skilled in the art could place Sedille's control apparatus in a single hermetically sealed casing for the purpose of protection from dirt and weather without the exercise of invention.

H. Appellant contends that the term "schedule" has a restricted meaning in the jet-engine art, and the board's holding otherwise was erroneous.

We find no proof in the record that "schedule" has any *special* meaning in the jet-engine art. Sedille teaches "co-ordination" which Webster's dictionary, 3rd Edition, defines as "harmonious adjustment" which we feel is equivalent to appellant's use of a "schedule" to harmoniously control his fuel feed.

All of the many contentions raised by appellant on this aspect of the case have been examined and we believe they are adequately covered by our discussion *supra*.

### The rejection of claims 42 to 45 as non-statutory.

The issue involved in claims 42 to 45 involves that portion of claim 42 (43 and 44 being dependent therefrom, 45 being substantially the same as 42) devoted to the coordination of the control mechanisms. The examiner and the board considered these mechanisms to be included in the claims as a catalog of six different elements. The only relationship between the elements set out in the claims is as follows:

"* * * all of said regulating controls having means so operatively associated with each other as to constitute a unitary, integrated system for controlling the performance of said engine under various operating conditions, by coordinately regulating the fuel supply to said main combustion chamber and to said afterburners, and the area of said exhaust gas nozzle."

The board was of the opinion that the quoted language defines the relationship between the controls so broadly as to fail to point out appellant's invention and meet the requirements of 35 U.S.C. § 112.

Appellant contends that the term "operatively associated" in the claims is sufficient to define the working relationship between the various controls, particularly in view of the result achieved as set forth in the remainder of the claims.

We must agree with the Patent Office that the words "operatively associated," considered alone, call for no particular type of association. The separate controls in Sedille are "operatively associated" in that they are all within easy reach of the pilot and all affect engine operation.

Appellant reads special meaning into the broad language "[constitutes] a unitary, integrated system for controlling the performance of the engine under various conditions * * *." An otherwise unpatentable claim cannot be rendered patentable merely by stating the results obtained from the use of recited structure. In re Arbeit, 206 F.2d 947, 41 C.C.P.A., Patents, 719.

The particular feature or fact upon which patentability is predicated must not only be disclosed in the specification but must also be clearly stated in the claims. In re Berliner, 195 F.2d 918, 39 C.C.P.A., Patents, 928.

Since claim 42 does not sufficiently describe the essential relationship that gives the instant control apparatus patentability over the prior art, it also fails to define a combination. Thus, the elements which are recited, having no limitation adequately describing their relationship, which relationship is vital to their patentability, must fall as merely reciting an unpatentable aggregation. In re Custer, 173 F.2d 226, 36 C.C.P.A., Patents, 927.

Dependent claims 42 and 43 and claim 45 fail for the same reason.

Appellant urges In re Worrest, 40 C.C.P.A., Patents, 804, 201 F.2d 930, as support for his claims. In that case the board's aggregation rejection was reversed because it was held that it is not necessary to a valid combination that all parts be in operation at the same time and react directly upon one another. It is clear to us that this principle is not applicable to the instant situation since the claims simply do not define any essential relationship upon which appellant can predicate patentability.

Appellant asks us to note that each of the six component controls of the alleged invention is defined in terms of a means plus a functional statement as to its mode of operation which the board found to be adequate in reversing the rejection of claims 38, 39, and 40 of the instant application. The board's reasons for *allowing* those claims are irrelevant. We are here concerned only with whether the appealed *rejected* claims have been properly acted upon by the board, and we have concluded that the board properly rejected claims 42 to 45.

For the reasons set forth above, the rejection of claims 24 to 27 and 42 to 45 is affirmed.

Affirmed.